May it please the Court, I'd like to reserve five minutes for rebuttal. The United States and the defendant intervenors want the injunction vacated because they think the district court was right, or alternatively, even if it was wrong, the project should proceed first and have the environmental impacts considered on the fly while the project continues in construction. This build first, investigate second approach is not what Congress had in mind when it passed NEPA into law. It is asking too much for bureaucrats to change their minds after a project is planned, funded, and construction begins. This Court pointed out in 1988 in the Save the YAC case that there are problems of administrative sclerosis, of inflexibility once a decision is already made before the NEPA analysis has been conducted. The precedence of this Court had been consistent over the years, and just on November 6th in the Pitt River Tribe case, this Court again rejected the decide first, investigate later approach. The failure to supplement in this case was not cured by the Supplemental Information Report, the SIR, because the SIR's analysis did not support its conclusions, or as in the Earth Island One case, the SIR didn't even address one of the major environmental issues. The one it missed in its entirety was a salt and sea recharge through the New River. Of the 70 to 100,000 acre feet of water that seeps down from the canal south into the agricultural farmlands of Mexicali, part of the drainage flows into the New River. We know that because of the uncontradicted declaration of hydrologist Stephen Larson. We also know that because Reclamation gave us many of those facts in the Salt and Sea Recovery DEIS, which it did on a related project. How much of the water flows back into the salt and sea, we don't know. We do know that the hydrologist Stephen Larson was able to get from the Mexican Water Authority's water meter readings showing 16,000 acre feet a year coming from the drain mesa. That's the lot of water. In this court's recent decision, again a November 6th decision in Klamasiskio, this court held that when there is a question raised about an environmental impact, there is actually a low standard for requiring the government or the agency to investigate that. It may be a low standard, but I submit that the declarations of our nationally renowned experts exceeded that standard by a lot. The hydrologist Stephen Larson's declaration, there was two of them actually, the government did not seek to rebut either one. Are you arguing the NEPA claim now? Yes, Your Honor. Isn't that an issue that could have been raised when the original report was issued? In 1994, it wasn't known. You're talking about the New River? Yes. That was known. Well, it wasn't known to Reclamation, apparently, because they It was known to you. It should have been known to you. The question is, isn't that an issue you could have raised when the original EIS was filed? It can only be, you know, it's a good point. The information wasn't the answer. The answer is it's not, the physical facts were there, Your Honor, but the knowledge of what they meant was not known. It wasn't known to Reclamation. It wasn't known to CURE. In fact, CURE didn't even exist until 1997. What I think the policy should be is that if people know of information that's relevant, they should participate in the FEIS process. But if people don't know that it's relevant, and the government apparently didn't know either, and the government is the expert here, then the environment isn't to be put at risk because everybody overlooked it. Could I take you on a detour from where you are? Because this other issue concerned me more, and it did seem to me that maybe what was driving your case was the claim of water rights on the part of the Conseil de Desarrollo. Do you say anywhere in the First Amendment complaint that the Conseil has property in the United States? The Conseil does not. Our members do have property in Mexico. And how does that give them standing to come here? It gives them standing to come here because the water is a tributary that begins in the United States. I understand that, but how does the constitutional barrier against takings of property in the United States apply to the taking of some of these property in Mexico? Well, there's two aspects to that, Your Honor. One that, as we cited in our brief, there are many examples of foreigners. For example, there is a Cuban case that he's complaining that the change in currency regulations deprived him the ability to take his money from the New York Bank into Cuba. That's right. He has money in the New York Bank. That's true. I mean, I want to see some property in the United States before I think the Constitution protects it. The property begins under the All-American Canal. The money is in the bank. The water is under the canal in the United States. But the question is, does any member of Desarrollo have a property right in the water while it's still in the United States? Its property, its use of fructuary interest in the water in that stream is a stream that begins in the United States. Its use of fructuary interest is not an ownership right. It's a right to use. It's not ownership. It's a right to use upon withdrawal. Well. You don't have a right to use it while it's still underground. So the question is, your right ripens on withdrawal. I think that the United States Supreme Court in Ide v. United States answered this question in part when it said that reclamation could fix seepage if it acted promptly. By the way, what law governs that claim? Your claim for, you know, that you have a right taken away. Is that federal common law? Well, Your Honor, I think 702 of the APA. Doesn't give any substantive rights. You have to have a right to rise under some other law. That's right. If I ask, what law does that arise under, that right? Your Honor, I think that it rises both under Mexican law, that these people. Then law applies to water in the United States? I think it applies to the, it applies to the water in Mexico. And that, that the law of nations recognizes that there has to be an equitable apportionment in, as we cited in the brief. And that this law is common throughout the western states. It's also common internationally. Did you claim that there's a violation of the treaty because or some accepted international law because there's no equitable apportionment? On your international, is it an international law claim you're making? I think it's both, Your Honor. I think we have, that there's not a true conflict of law here. Because at the law, at the state level. And the law in the Mexican level. And the law at the international level. Is all common when it comes to continuous use of water for 60 years. While the persons on the other side of the border know that you're using it. They built the canal knowing that it would leak water. And worse yet, when it started leaking in the 1940s, it actually flooded Mexico. And hurt this land, requiring my clients and their companies and their government to construct a high cost infrastructure to harness this water. Well, that's all regrettable. But it doesn't really answer the question. Now, I may have missed something. Okay. But as I understood your complaint, you were asserting that the Mexican Constitution and the law of Mexico protected your water right. Do you assert anything else in the complaint? Yes, we do, Your Honor. We claim also under the law of the western states, including California, which recognize that a state can abandon its water. But you've got to have property rights to raise it. Where is your property? Our property arises from our use of the stream that is common and begins in California and ends in Mexico. I mean, you cite IDE, but IDE deals with rivers within the United States. It doesn't have anything extraterritorial of application. No, that's true. But what IDE stands for is that the government can lose the right to seepage by abandonment. Sure, you can lose the right, but that doesn't necessarily mean that someone else acquires the right. I think that's the point. Let me ask you, are there any cases from California, state cases, or any other state that would recognize the right that you're asserting as a property interest? The Dannenbrink case from the 1920s recognizes the abandonment, the acquisition of seepage through abandonment. That case upheld the trial court in awarding to the defendant a prescriptive right through abandonment. In that case, there was 25 to 30 years' use of the water to grow a vineyard. Here are the facts of the estoppel. And the facts as pleaded, and we get the benefit of facts on this procedural posture, Your Honor. This actually is very similar in terms – the motion to dismiss, we submit, was premature, because under Ramirez de Arellano v. Weinberger, which is a D.C. circuit case, 1984, that involved Honduran property owned by an American, which the Department of Defense was using to train contras. And that was a tough case involving a lot of tough issues. But since the Court of Appeals said, wait a minute, there are some hard factual questions here, and the outcome can depend upon the facts, the motion to dismiss should not have been granted. This case comes up to you, we submit, in the wrong posture, because the facts on estoppel, abandonment, have to be accepted as true. I know I'm not giving you much of a chance to present, Your Honor, but we're really trying to deal with the questions that trouble us, so I hope you'll forgive me. I've had a chance to tell you what I'm already interested in, in my briefs, Your Honor, so that's why we're here. And I'd like to shift to the treaty between Mexico and the United States that says Mexico doesn't have any right except those spelled out in the treaty. And why isn't that dispositive? Well, rights to what is the response? And as we read the treaty, it applies to surface water. On this earth, water exists on the surface, under the ground, and in the air. If the United States' interpretation that it applies to all water emanating from the river system were true, then Mexico would be charged for the rain from the clouds, from the Rio Grande and from the Colorado. At what point does this water become... How long does it run underground? It can run underground... No, but how long does it? How long could it? Well, has it? It's run underground for time immemorial. The Grand Canyon was cut through the Colorado River. No, but as it runs now, at some point, it comes up to the surface? Parts do at the Andrade Mesa wetlands, they do, Your Honor. Most of it does not, and it goes into the aquifer, which has been there for millennia. And you're making a very interesting... Of course, the treaty says if there's any dispute, you refer it to the international commission to decide. Not disputes between individuals, only at the national level. This groundwater issue, though, is important, whether the treaty was intended to reach it. Roy Tipton, who was the chief engineer at the time, thundered in the Senate hearings, why haven't you folks dealt with groundwater in this treaty? All the scholarly comment at the time, and since then, Stanford Law Review, we've cited in many other places, all state that groundwater was not intended to be reached by this treaty. Yes, there are some verbal formulations in Article 10, which, if you read them one way, could support that interpretation, but those words are plastic enough that you could read them another way. In terms of the historical context, nobody intended this to cover groundwater. That's why I think the Eastern Airlines case, where the Supreme Court says that you must consider extrinsic evidence when the treaty isn't real clear, that you must consider that as the right way to go. And Eastern Airlines, they did. Now, if we're going to consider extrinsic evidence, Your Honors, then the motion to dismiss should not have been granted. Well, you know, I read there's no, to a client, no right by the use of waters of the Colorado system for any purpose whatsoever. I mean, to my mind, that's about as clear as it can be. Look at where that sentence is, though. It's behind a leading sentence in that section that grants Mexico 200,000 acre feet of excess surface waters in the year. So the problem that these negotiators were dealing with at that time is what's the impact of that extra water Mexico can get? Right. So they're dealing with the whole question of how much water goes to Mexico. In the surface water. How do we know that? Because under the delivery provisions in Section Article 11 and 15, they talk about the water can only be delivered by the United States on the surface at specific points along the river. And this is also in the context of the law of the river. In the law of the river, starting with the Compact 1928, refers to the mainstream of the Colorado. The Supreme Court visited this issue just in, I believe, January or February this year when it issued its final decree on the California-Arizona dispute. And it must use the word mainstream 20 times in discussing what its injunction means. And it limits it to the mainstream. Remember, this treaty was in 1944. Issues of groundwater weren't as important then as they are now. If the negotiators intended it to reach groundwater, they would have said so. Before you sit down, any further questions? No. And I'll reserve. Sure. Good afternoon, Your Honors. May it please the Court. John Smeltzer for the United States. Your Honors, I will be sharing time with David Osias for the Imperial Irrigation District and Jim Davenport, time permitting, with the State of Nevada. By agreement, I'm hoping to use about 12 minutes of that time. Your Honors, I'm going to start with questions relating to counts 1 through 4, the property rights counts, and then come back to the NEPA and the other statutory issues. Quickly, Your Honors, the All-American Canal clearly is dealing with surface water from the Colorado River. And it's surface water that the United States is diverting. It's allowed by the treaty. And pursuant to federal law, it's for exclusive use within the United States. On the merits of the plaintiff's claims on counts 1 through 4, there is no basis for claiming a right by appropriation in the seepage of developed water. This isn't a tributary. The canal is not a tributary. This is surface water that is flowing from the Colorado River. But this water, you know, this water is charged, right, to the Imperial Irrigation District. And the IID is through with it when it goes through the canal. So it's kind of hard to make the argument. It's so subject to the Colorado River law, isn't it? Well, the quick point, Your Honor, is the IID has not received it when it's going through the canal. Well, it's charged for it. It receives it. Well, they've been charged for it. It receives it at the diversion point. That's correct. They've been charged for it, but it hasn't been delivered to them. And the broader point on the law and the merits... Sure it has. It's delivered to them at the diversion point. The broader point on the merits, Your Honor, is that... Well, it's been delivered to them. It's the receipt of it by them. It's charged to them, and it's gone. It's off the books of the Colorado River system, right? Well, the question is whether you can ever claim a right by appropriation in water that's under domestic law, under United States law, and pursuant to the treaty is within the... That's a different question. Well, that's the question I was addressing, Your Honor. And the more fundamental point with respect to counts one through four is that the plaintiffs have not established this Court's jurisdiction or that those counts are justiciable. With respect to jurisdiction, they rely exclusively on the Fifth Amendment, Your Honors. And even if there is somehow some kind of property right that could be cognizable under the Fifth Amendment, the only remedy for a Fifth Amendment claim by implication in the Fifth Amendment itself is a remedy for just compensation. There is one exception, and here again we're talking about an act that was taken pursuant to statute, duly authorized by Congress. And so in that context, the only exception is where Congress has both taken away or both affected a taking with its statute and taken away the Tucker Act remedy. There is no indication here that through the San Louis Ray Act that Congress intended to take away the Tucker Act remedy. So if there is any sense that this has affected a taking, the only remedy is a remedy under the Tucker Act. And this obviously is not the right proceeding for that. The cases that they cite that suggest that injunctive relief is available deal with that special case when the remedy has been taken away or deal with Fifth Amendment cases that are not takings cases. Quickly on justiciability, in the reply brief, they raised two points. They point to the district court's decision on the United States NEPA claim, and they point to law from this court on NEPA issues. The justiciability argument is relating to counts one through four, not with respect to the NEPA claim that we're pursuing before this court. And it's a completely different issue. And it's the issue as to whether you have a claimant on both sides of an international border claiming title to a property right that's claimed by the United States, whether that's the kind of issue that can ever be within the jurisdiction of this court, and we submit it is not, and they have no answer for why that should be. It's a claim by individuals who claim property in the United States. Those are the kinds of issues that we deal with all the time. It's not a claim of the nation of Mexico. Well, it is a claim by individuals in Mexico against the United States, which is the same thing. It's essentially a claim. You may have a sovereign immunity argument on that, but I'm not sure I agree that it's not justiciable. Your Honor, there is no common law that governs that kind of circumstance, as we were discussing in questions with the plaintiffs. It doesn't fall under Mexican law, because Mexican law doesn't apply to the United States. Doesn't that go to the question of whether or not they have a property interest, not whether or not the question is justiciable? That goes to the question of whether there is a set of standards that this court could adjudicate, and it's the classic circumstance when you have cross-border disputes about a common water resource that those are channeled into the direction of the treaty power. If the treaty covers it. What I'm saying, Your Honor, well, there's two issues here. First, it implicates the treaty regime and obligations pursuant. No, no. None of the treaty can properly be read to exclude groundwater. Well, Your Honor, the point. And this water is properly classified as groundwater. Point six of Resolution 242, if I've got my terminology correct, is pursuant to the treaty regime and applies directly to the development of resources on either side of the border, and it's within the existing treaty regime. And even if there weren't the existing treaty regime, it is definitely the kind of dispute that no court, that they have cited any case, domestic case where any court has ever gotten involved in a circumstance where you've got claimants, you know, on one side of the border and claimants on this side of the border, a court of the United States adjudicating that kind of claim. It's simply, it's unprecedented, and it's not the kind of issue that this court has standards to apply to. There's an existing treaty regime to govern it. It implicates foreign policy decisions of the United States. It's simply, you know, not... They aren't claiming a private right under the treaty, as I understand their claim. They're claiming a private right under either United States common law or state law. If they've got a state law claim, we can judge it. If they're entitled, through whatever mechanism, to have a right to water in the United States, that's something that we can consider. Your argument is, you know, there is no such right, but that's a different question from justiciability, I think. Well, I think what Tom is trying to tell you, you know, you may be spending too much time on that argument. You have lots of other things to argue. I don't know how much time you have reserved for yourself as opposed to your co-counsel, but I have a couple of questions I want to ask you about the NEPA claim and the ESA claim. Your Honor, please, I... Well, the first question is, is Defenders of Wildlife correct that there are many, many instances where the Bureau of Reclamation has conceded that, you know, that both of those acts have transnational implications? Your Honor, Reclamation has not conceded. What Reclamation has done is, in multiple instances, they have taken a look at extraterritorial impacts. Now, why have they done that in those cases but not in this case? Well, in all cases, and they did do it in this case, in all cases, they're governed by, in addition to NEPA, they're governed by the Executive Order, Executive Order 12114, and they have taken that look. But the fact that they've done it in prior cases doesn't, in no way, goes to a question or is relevant to the interpretation of the territorial scope of the statute. They don't have any particular discretion delegated to Reclamation for interpreting the statute to begin with. And just simply by looking doesn't mean that they're confessing that that's, they could be compelled to do so in a court of law in a case such as this one. On the question of NEPA extraterritorial impacts, Your Honor, we submit that what NEPA in Section 102.2.C requires is a focus on the effects of an action. And what it does is a compel investigation concerning the impacts of an action and the consideration of mitigation. And when those impacts and when those potential mitigation effects occur within a foreign country, the duties imposed under NEPA are fairly considered extraterritorial and the presumption against extraterritorial application of the statute should apply. Your Honors, transboundary impacts are different in kind from domestic impacts in several ways. First, there are the practical considerations that the agencies do not have, Federal agencies do not have regulatory power to investigate. But the claims here are purely involved actions on this side of the border. As I understand it, they're not asking you to order any mitigation transborder, right? Well, I mean, the complaint is about the Federal proposed action that occurs exclusively in the United States. The impact may be in Mexico, but the Federal action is here. Right. The point I'm making, Your Honor, is when you look at NEPA from a matter of statutory interpretation, the critical aspect of NEPA is the effects and the analysis of the effects. And when they do occur transborder, and when that is the claim in this case, it's an argument about transborder impact. That raises implications that are quite different from, distinct from, domestic impacts. And therefore, raise the same set of concerns that have animated the decisions of the courts with respect to the presumption against extraterritorial application of statutes. And that the presumption we submit should apply in these cases for a number of reasons. The question about where the action occurs is a question about legislative control, but that's not the only factor, as we've indicated in the briefs, that governs this presumption. And you think that you've been acting inappropriately by pursuing the executive, implementing the executive order, which requires you to consider extraterritorial impact? I mean, VOR has been considering transborder impacts in other cases. Yes. So that's, you've been acting ultra virish, shall we say? Absolutely not, Your Honor. We consider it in this case. We have a duty, the Bureau of Reclamation has a duty pursuant to the executive order to do so. The issue in this case is not whether you have a duty to look across the border. The issue in this case is whether the duty emanates from NEPA. And the question is, in the interpretation of the statute, are transboundary impacts different in kind and in a fundamental way from domestic impacts? And we submit they are. Again, for, the question is whether NEPA, I mean, obviously they're of different character, but whether or not NEPA requires it is another matter. Well, the point is, Your Honor, because they're fundamentally different, it's like the small case. It's a case where you've got domestic impacts, but you've got a sort of an international aspect to it. The question of, you know, whether a conviction in that case, whether Congress intended to include international convictions. Congress looked at this presumption because there's something different about international convictions that Congress couldn't be sure that, or that the courts couldn't be sure that Congress intended to include when they wrote that statute. The same applies in NEPA, because when you're dealing with transboundary, extraterritorial impacts, you're dealing with issues that are beyond the agency's particular control to investigate, beyond the control to mitigate. And there are issues that raise foreign policy concerns and implicate existing treaty regimes and issues that are normally addressed through treaties and raise concerns about the scope of judicial review. I mean, essentially what you have in this case... Why does the examination of wetlands and the impact on potentially endangered species in wetlands impact foreign relations? Isn't that the question of whether or not we're trying to preserve the species? Can you take that into consideration in a NEPA analysis? I mean, you're not asking the government of Mexico to do anything. The question is about the federal action in the United States. Well, the question is the interpretation of the statute, and the particular facts of this case don't necessarily compel the answer to the statutory interpretation question. We submit, though, that the particulates of this case do illustrate that foreign policy concerns can be implicated by the issues about... This case is fundamentally about the use of resources. The use of resources within the United States, and by using those resources in the United States, the allegation is they're having impacts across the boundaries. It's our decision on whether or not we want to take those impacts into consideration. That's the decision of Congress. We just have to decide whether or not Congress intended that. But there's nothing that would prohibit Congress from deciding on a purely domestic basis to take those impacts into consideration. Our argument is not that Congress is prohibited from doing it. The question is, did Congress overcome the presumption against the extraterritorial application of statutes in this context? And there is nothing in the text of Section 102.2c to suggest that Congress did so, given Congress did not address any of these particular concerns, and the particular foreign policy concerns that come up in the cross-border context. Is that your answer to the argument that one of the new developments, which makes the supplemental report insufficient, is the discovery of the Andrade wetlands after the initial EIS was filed? Excuse me, Your Honor. There are essentially two answers to that question, and the one is that those impacts are beyond the scope of NEPA. The second answer is... No, you shouldn't look at that at all. No, we're not saying we shouldn't look at it. We did look at it. We're saying the obligation to look at it arises under a different set of regime. It arises under the treaty regime. It arises under the executive order. But the other answer to the question, Your Honor, is the public citizen rule of reason. And there, Your Honor, what the Supreme Court held is that an agency has no obligation to consider impacts where those impacts will not meaningfully inform the decision that's before the agency. And in this context, we submit, Your Honor, that given the background principles of the rule of river and the statutes that govern reclamation in the United States and the delivery of water through the All-American Canal, the reclamation had no discretion to make a decision to deliver water to Mexico. Let me put the question slightly differently. Let's assume the wetlands were within the territory of the United States. You would agree that a supplemental environmental impact statement should have been prepared, right? If the discovery of the wetlands and the consequences, if the wetlands were the same facts in the United States, you'd agree that a supplemental EIS should have been prepared, right? We'd agree that the reclamation would have to take a look at it. There was no determination that the impacts were significant vis-a-vis what reclamation was doing. But again, with respect to whether reclamation could deliver water for mitigation purposes, if it's not within the confines of the San Luis Rey Act and the authorities that govern the delivery of water through the canal, there is significant restrictions domestically as well, Your Honor. I'm into my remaining five minutes, so I need to... Thank you, Your Honors. David Osias. May it please the Court for the Imperial Irrigation District. I think the last set of questions immediately went to the intersection of both topics that you've been addressing today, both water and NEPA, and how do you overlay NEPA when there are significant constraints in the United States about the use of water. I think the first point, Your Honor, is the Colorado River... Your Honors, excuse me. The Colorado River is one river divided between two nations in its entirety. There's no other water, no other person, entity can claim Colorado River water other than the two nations, and it's governed by the treaty. And the litigation is not about the water that's in the ground. Going to the Justice's question, when the water's in the ground in Mexico, there may be rights to it under Mexican law. I profess to know nothing about Mexican law. But the water that we're litigating over is in Lake Mead currently, which plaintiffs wish to compel to be released down the river and diverted into the All-American Canal so it can then leak out. That's not water that's in the ground. That's water that's in Lake Mead. As a result of that, it is proper and necessary to consider the treaty, the compact, the Boulder Canyon Project Act, the contract with IID and the Secretary, the Supreme Court decree, and the San Luis Rey Act, all of which govern that water while it's in the United States. No property interest can be asserted in that water while it's in the United States. State law is not a source. The Dannenbrink case expressly says that the right to appropriate seepage water arises when the seepage water returns to the stream from which it was appropriated through the ditch. There is no allegation in the First Amendment complaint that this seepage water finds its way back to the Colorado River. In fact, if it did, the IID could not be charged for it. Justice has already noted that it is. How does that affect the NEPA claim? Well, when we go through the it's more than a troika, I don't know what the phrase is, but there's a treaty, there's the congressional legislation, there's the decree, there's the San Luis Rey Act, we find that no additional water from the Colorado can be delivered to Mexico. AAC conserved water under congressional mandate can only be used in the United States for California agencies and the tribal bands. There's no other water to provide to Mexico from the Colorado River under the treaty. IID is prohibited from ordering water for Mexican use. It's contract and the decree enjoin it to only use diverted water in the United States. And so, going to the, maybe to the very last question that was on the table, if water can't be sent to Mexico or the equivalent, if the savings can't be preserved solely to cause water to go to Mexico, which is what we have stated in our papers, then public citizen would say, why study the impact of that water not going to Mexico? What decision will you be able to make by studying it? You can't make the decision to allow it to go. And in all of the pleadings, and you have a lot up there and my office looks like that, there's not been one suggestion by any of the appellants of how impacts from reduced seepage could be mitigated without water. And that's because it's, the very act of saving the water is what causes the impacts, some of them complained of, and to mitigate it requires water. So, it's that public citizen regime that we think makes this case more like public citizen than public citizen was itself. Here the impacts in Mexico, there they were in the United States, here the district court found they were speculative, there they were actually acknowledged. Here they were studied somewhat. How do you deal with the salt in the sea argument? Essentially the court looked at the northward seepage and not the southward seepage and the southward seepage eventually comes back to cause damage in the United States. First, Your Honor, I would say that it's incorrect, although it is in the appellant briefs, to say that the district court did not look at the southward seepage. The district court, in fact, did identify the claim that the water seeping into the ground, some of it might be pumped, some of that might find its way into a drain, some of that might find its way into the river, and some of that might find its way into the salt and sea, and found that that causal connection based on the percentage of the seepage, recharging that aquifer, was not reasonably close. It actually used, again, the public citizen language and the Metro Edison case language, that the salt and sea is sort of like at the end of a bead of pearls. There's not a reasonably close causal connection, and therefore, for that reason, and because sending water into Mexico was prohibited under the regime I went through, that mitigation was beyond the control, and that was one of the questions here. There is no control in Mexico of water consumption, and therefore, studying that in a SEIS was not necessary under the standards. Thank you, counsel. Mr. Davenport? We're going to... No, we're going to... I know we're already over time, and I appreciate very much getting the opportunity to say just a few words. I want to speak about judicial deference in treaties. As you know, the Constitution gives the President and the Executive the authority to do the foreign policy of the United States. Article 3 of the Constitution does not confer a similar power on your honors. Now, we have here a treaty which... the interpretation of which has been raised by the appellants. So we have a question whether what you're asked to do is interpret the treaty or amend the treaty. All of the arguments they make essentially ask you to read out of the treaty something that is there or read into the treaty something which is not. That is... to do that is to amend this treaty. Because they ask you to amend this treaty, the Article 2 of the Constitution reserves that power to the Executive Branch. You should not reach it. Should you reach it, and you look at their question, David's point is the valid one, they're seeking a right to the source of water in the U.S. waterway. They're not seeking water in the ground. Therefore, the argument that they make about the interpretation of the treaty avails them nothing. Should you rule that groundwater is not the subject of this treaty, it doesn't give them any right to the source of the water in the canal. So you really needn't get to that issue at all and you should not get to that issue at all because of the Constitutional limitations. Thank you. Good afternoon, Your Honors. Melissa Hathaway-McKeith on behalf of the U.S. Plaintiff's Cure, City of Calexico, and Desert Communities Against Pollution. I want to start with responding to Judge Tashima's question with respect to what was different in 1993 and today on the Salton Sea. The big gorilla in the room is that no one has talked about the huge transfer of water from the Imperial Valley to San Diego, the quantification settlement agreements, hundreds of thousands of acre feet of water that was not contemplated in 1993 and that's at the crux of what the cumulative impacts are of these water transfers in both countries that have not been addressed. Now, I think that deference, which the gentleman who just spoke before me mentioned in the relationship to NEPA, we are only seeking a supplemental environmental impact study and I'm going to speak to deference in that context and also why the damages and the equitable weighing of factors would militate in favor of the injunction remaining in place until an SEIS is completed. A couple factors. First, the trustworthiness of the statements by the United States government. Second, the lack of transparency since 1993 and third, the passage of time and why deference starts to shift the longer out we go and the fact that there are these significant issues that were not addressed like the cumulative wetlands issues, air quality issues which were addressed at length by DCAP and were not discussed here and the cumulative following of farmlands on both sides of the border and what that means for the socioeconomic issues in this particular area. I want to draw your attention to docket number 288. There was a declaration by Claire Hervey. It starts with a letter from John Keyes, defendant in the Bivens claim, former head of the Bureau of Reclamation. So then wrote to the United States saying we want to comment in 2002 about the quantification settlement agreement and he wrote back saying these are unrelated agreements you shall not comment in the United States on these particular issues and I'm paraphrasing please take a look at the letter. Mr. Osias whose statements are attached to that declaration also confirmed that these two agreements are not related. Today however you have thousands of pages in front of the court saying that the entire Colorado River will flow through the state. You submit the declaration of an expert Paul Rosenfeld. Yes. What is the law on that? Can you challenge what the agency has done with a declaration that was not before the agency? Well the purpose of the SAAS is to open up the public administrative records so that that information is before the agency. It was done behind closed doors. It was very result oriented and I think we documented at length where in fact... So your answer is the way that could come in is through what? Through public hearings. If there were an SEIS then the declarations that we have submitted would go before the decision makers and this is important. Why should we open them up? Because there has not been a single public hearing again attached to docket number 288 since 1993. That's 13 years and that's an admission by the general council of the Imperial Irrigation District that there has been no public hearing on the lining of the canal. A lot has changed since 1993. Most significant the larger water transfer from the Imperial Valley to San Diego which has its own implications, its own socioeconomic implications. This is a region. Calexico, US citizens are more dependent upon what happens in Mexicali than San Francisco is relative to Oakland and yet there has been no analysis of how any of the effects in Mexico revert back to the United States. Either cumulative air quality, job related issues, the socioeconomic issues which have not been addressed since 1993. It's a different world and there has been no opportunity to get this information before the US government. None. They did after the lawsuit was filed. This is another reason to be suspicious aside from the fact that they changed their story so many times. After the lawsuit was filed, we did the 90 day notice. We requested the opportunity to communicate with the federal government which we never got a response. After the lawsuit is filed, they do the supplemental information report on their own. Right before we were filing motions for summary judgment, never before was there a motion to change the water claim. There is this impression that water is critical to the underlying determination. First of all, you could look for alternative sources of water for San Diego. Second of all, even in the 1993 EIS, there was a well pumping solution that would not have created the air quality issues. It was identified as a less environmentally affected alternative. In today's economic realities, environmental realities, in this particular watershed, the share watershed, the share air basin, an area where the kids in Calexico highest asthma rate in the country are going to have to breathe worse air because no one has openly looked at the air quality issues. Where the canal is no longer as safe as the original design which had been adopted in 1993. There are children, our children in the United States who swim in that canal because I don't have any place else to swim. And where the parents go back and forth across the border every day in a shrinking agricultural economy and no one has looked at the economic effects that taking land out of production which was not contemplated, Judge Tashima, in 1993 since the Imperial Valley was not going to be moving all of that water to San Diego. There was not the issue of fallowing to be addressed in terms of what that meant on our side of the border and with the All-American Canal lining. Our unrefuted declarations show that there will be fallowing of substantial numbers of acres of land there. Now, the U.S. says we don't have to care. Deference, you know, deference is elastic. And I look at it and it has to be tempered by justice and it has to be tempered by the practical issues on the ground. And here we have the case of  and it has been 15 years since there has been any full and fair public participation in the process. And I think these people on the north of the border and the environment deserves to have a fair and open analysis of the options that are available today that would mitigate against the environmental consequences that have been caused by the   So,  thank you all for being here and we appreciate you coming here. We had significant time constraints in your presentations and I think you hit the critical points we were interested in very well. So, thanks to all of you and we will be in touch        we'll   next briefing.   for the next briefing. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.  Thank you. Thank you.      Thank you. Thank you. Thank you.
judges: Noonan, Hawkins, Tashima